# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

R.S., *a minor, by and through her mother,*
S.S., *individually and on behalf of her daughter,*

         Plaintiffs,

v.

MINNEWASKA AREA SCHOOL DISTRICT
NO. 2149; GREGORY OHL**,** *Minnewaska School
District Superintendent, in his individual and official
capacities*; MARY WALSH, *Minnewaska Middle
School Counselor, in her individual and official capacities*;
JANE DOE, *in her individual and official capacities*;
COUNTY OF POPE; PAUL GERDE, *Pope County
Board Chair, in his official capacity*; TIMOTHY P.
RILEY, *Pope County Sheriff, in his individual and
official capacities*; GILBERT MITCHELL, *Pope County
Deputy Sheriff, in his individual and official capacities*,

         Defendants.

**Memorandum of Law & Order**
Civ. No. 12-588 (MJD/LIB)

Wallace G. Hilke and Bryan R. Freeman, Lindquist & Vennum PLLP, and Teresa
Nelson, American Civil Liberties Union of Minnesota, Counsel for Plaintiffs.

Timothy J. O'Connor and Teresa E. Knoedler, Lind, Jensen, Sullivan & Peterson,
PA, Counsel for Defendants Minnewaska Area School District No. 2149, Gregory
Ohl, Mary Walsh, and Jane Doe.

## I.    Introduction

This matter is before the Court on a motion to dismiss [Docket No. 13] and

a request to file a supplemental brief [Docket No. 22] by Defendants Minnewaska

Area School District No. 2149, Gregory Ohl, Mary Walsh, and Jane Doe ("school

defendants").  The Court heard oral argument on July 13, 2012.

## II.    Summary of Case

This case comes before the Court at an early stage, when the Court has

heard only one side of the story—that told in Plaintiffs' complaint.  At this stage,

the Court must consider those facts, recited below, to be true.  As this case

proceeds, facts may be developed which change the Court's conclusions.

Plaintiffs' complaint alleges a school official punished R.S.—a twelve year

old student at the Minnewaska Area Middle School—for two postings on her

Facebook wall.  One posting expressed her dislike of an adult school employee

and another expressed salty curiosity about who had "told on her."  Plaintiffs

argue that the punishment of her out-of-school wall postings violated her First

Amendment right to free speech.  Plaintiffs further allege that school officials

forced R.S. to involuntarily surrender her Facebook and email passwords upon

their learning that R.S. and one of her classmates had an out-of-school sex-related

conversation. They argue that the officials' subsequent search of R.S.'s private Facebook account constituted an unlawful search under the Fourth Amendment. Plaintiffs also assert a number of other claims under federal and state law based on the same alleged conduct.

The defendants argue the actions alleged by Plaintiffs did not violate the Constitution. They further contend that they are entitled to immunity because, even if a constitutional violation did occur, R.S.'s constitutional rights were not "clearly established" at the time of the challenged conduct.

The Court here concludes only that, if true, the facts set out in Plaintiffs' complaint amount to violations of R.S.'s constitutional rights and that those rights were clearly established at the time of the alleged conduct. The Court also concludes that certain claims advanced by the Plaintiffs—civil conspiracy to deprive R.S. of her civil rights and intentional infliction of emotional distress—have not been sufficiently pled. The Court therefore dismisses those claims. At this early stage, the Court passes no judgment on whether the defendants committed the acts alleged by Plaintiffs or whether the defendants will ultimately be found liable for such acts. The school defendants will be free to raise their immunity claims and other defenses after discovery in this case.

### III.    Background

At this stage, the Court considers the following facts—set out in Plaintiffs'

complaint—as true:

### A.    Punishment of R.S. for Her Facebook Wall Posts

Plaintiff R.S. is the daughter of Plaintiff S.S.  At the time of the facts alleged

in the complaint, R.S. was a twelve year old, sixth grade student at Minnewaska

Area Middle School in the Minneswaska Area School District in Glenwood,

Minnesota ("District").  (Compl. ¶¶ 4, 17.)  Sometime in early 2011, R.S. posted a

message to the "wall" of her account on the internet website

"www.facebook.com" ("Facebook") about a particular adult hall monitor at

school ("Kathy").  (Id. ¶ 19.)  She wrote something to the effect of:  "[I hate] a

Kathy person at school because [Kathy] was mean to me."  (Id.)  R.S.'s posting on

her Facebook wall was intended to be accessible by her Facebook "friends," but

not by members of the general public.  (Id.)  Facebook's website is inaccessible

from school computers, and R.S. posted the message from home, outside of

school hours.  (Id. ¶ 20.)

Apparently, one of R.S.'s Facebook "friends"—one of the people

authorized by R.S. to view her wall postings—viewed and recorded the message

about Kathy, as that message made its way to school Principal Pat Falk. (Id. ¶ 21.) Principal Falk called R.S. to his office and told R.S. that he considered the message about Kathy to be impermissible bullying. (Id. ¶ 22-23.) Principal Falk required R.S. to apologize to the hall monitor and gave her a detention, for behavior described in disciplinary records as having been "rude/discourteous" and "other." (Id. at 23.)

R.S. was disciplined once more when she published a second message on her Facebook wall which stated: "I want to know who the f%$# [sic] told on me." (Id. ¶ 25.) School disciplinary records indicate that R.S. was punished for "insubordination" and "dangerous, harmful, and nuisance substances and articles." (Id.) In response to this message, R.S. was given a one-day in school suspension and was also prohibited from attending a class ski trip. (Id.)

**B.    Search of R.S.'s Private Internet Accounts**

R.S. further alleges that on or around March 10, 2011, school officials received information from the guardian of a male student who complained that the boy was communicating with R.S. about sexual topics via the internet. (Id. ¶ 27.) A school official called S.S. and told S.S. that the boy had admitted that he initiated the online conversation about sex. (Id. 28.) On the same day, a school

counselor—Defendant Mary Walsh—called R.S. out of class to ask her about the alleged conversations.  R.S. told Counselor Walsh that she had been talking about "naughty things" with her classmate via the internet, off school grounds, and outside school hours.  (Id. ¶ 29.)

Counselor Walsh allowed R.S. to return to class, but R.S. was called out of class a second time on the same day.  (Id. ¶ 30.)  In the second instance, R.S. was taken to a room in the administrative office, which apparently was the office of Defendant Deputy Sheriff Gilbert Mitchell, who was assigned to the school.  In the room were Counselor Walsh, Deputy Mitchell, and an employee unknown to R.S. named in the complaint as Jane Doe.  (Id.)  Deputy Mitchell wore his police uniform and a taser.  (Id.)  The three officials asked R.S. about her conversations with her male classmate, and she again stated that she had been talking with him about naughty things.  (Id.)

R.S. alleges that the school officials then demanded that she provide them with her email and Facebook usernames and passwords.  (Id. ¶ 32.)  When R.S. hesitated and stated that she did not remember her passwords, the officials called her a liar and threatened her with detention if she did not give them her passwords.  (Id. ¶ 33.)  Feeling threatened and without a choice, R.S. eventually

relented and gave the school officials the information that they had requested. (Id.)  The school officials logged into R.S.'s Facebook account, viewing her public postings along with her private messages.  (Id. ¶ 35.)  While R.S. is certain the officials searched her Facebook account, she is not sure if they also searched her private email account because she could not see the computer screen.  (Id.)  The officials spent approximately fifteen minutes searching through R.S.'s communications, both public and private, apparently in an effort to find R.S.'s "naughty" discussion with her classmate.  (Id. ¶ 38.)

The officials did not limit their search to R.S.'s public messages.  They expressed surprise that R.S. had used profanity in some of her Facebook communications.  (Id. ¶ 39.)  They also allegedly viewed and commented on the fact that R.S. had taken "one or more online Facebook 'fun and funny' sex quizzes and had posted the result of some of those quizzes."  (Id.)  All three of the officials—Counselor Walsh, Deputy Mitchell, and the unknown official— examined R.S.'s private correspondence.  (Id. ¶ 40.)  At no point did they ask R.S. for permission to search through her private correspondence.  R.S. alleges that she was "intimidated, frightened, humiliated, and sobbing while she was detained."  (Id. ¶ 42.)

R.S. was not formally disciplined. After the search, Counselor Walsh called S.S. and left her a voicemail, relaying to her the events of the day, including the search of R.S.'s Facebook account. (Id. ¶ 45.) When she returned home from school, R.S. cried and felt "depressed, angry, scared, and embarrassed." (Id. ¶ 46.) She feared that school officials would again access her Facebook account or punish her. (Id.) She did not attend school for two days following the incident and alleges that she fell behind in her school work. (Id. ¶ 47.) Upon her return to school, R.S. felt "less safe" and had "lost her sense of security." (Id. ¶ 48.) R.S. alleges that officials at the school have required other students to similarly disclose their private information to allow school officials to search through their private communications under circumstances analogous to those experienced by R.S. (Id. ¶ 49.)

Plaintiffs' complaint sets out eight counts: Violation of First Amendment (Count I); Violation of Fourth Amendment (Count II); Conspiracy to Deprive Rights and Failure to Prevent Violation of Rights (Count III); Violation of Right to Free Speech under Minnesota Constitution (Count IV); Violation of Right to Be Free from Unreasonable Searches and Seizures under Minnesota Constitution (Count V); Invasion of Privacy under Minnesota Common Law (Count VI);

Intentional Infliction of Emotional Distress under Minnesota Common Law (Count VII); and Declaratory Judgment (Count VIII).

The school defendants have moved for dismissal of claims against the District, arguing that Plaintiffs have not sufficiently pled facts to show that any of the challenged behavior was done in accordance with the District's established custom or policy. They further argue that the claims against individual school officials in their official capacity should be dismissed because they are duplicative with the claims against the District. They next argue that the claims against school officials in their individual capacities must be dismissed because they are entitled to qualified immunity. They also argue that claims against District Superintendent Gregory Ohl should be dismissed because Plaintiffs have not sufficiently pled that he failed to properly supervise or train District employees. The school defendants further argue that Plaintiffs have not sufficiently pled their civil conspiracy claim. The school defendants also ask for dismissal of all claims brought by S.S. in her individual capacity because she has no direct claims against the school defendants. They finally argue that Plaintiffs' state law claims should be dismissed and that the declaratory judgment count should be dismissed as duplicative.

The school defendants have recently moved to supplement the record and for dismissal of claims for injunctive relief based on their discovery that R.S. no longer attends school in the District.

## IV.    Discussion

### A.    Standard

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a party may move the Court to dismiss a claim if, on the pleadings, a party has failed to state a claim upon which relief may be granted.  In reviewing a motion to dismiss, the Court takes all facts alleged in the complaint to be true.  Zutz v. Nelson, 601 F.3d 842, 848 (8th Cir. 2010).

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.  Thus, although a complaint need not include detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.

Id. (citations omitted).

In deciding a motion to dismiss, the Court considers "the complaint, matters of public record, orders, materials embraced by the complaint, and exhibits attached to the complaint."  PureChoice, Inc. v. Macke, Civil No. 07-

1290, 2007 WL 2023568, at *5 (D. Minn. July 10, 2007) (citing <u>Porous Media Corp.</u>

<u>v. Pall Corp.</u>, 186 F.3d 1077, 1079 (8th Cir. 1999)).

> **B.**     **<u>Monell</u> Claims against the District**

The school defendants first argue that all claims against the District itself

must be dismissed because Plaintiffs have not pled facts sufficient to show that

challenged actions were taken in accordance with District policy or custom.

> **1. <u>Monell</u> Standard**

"[A] municipality cannot be held liable *solely* because it employs a

tortfeasor—or, in other words, a municipality cannot be held liable under [42

U.S.C.] § 1983 on a *respondeat superior* theory." <u>Monell v. Dep't of Soc. Servs. of</u>

<u>City of N.Y.</u>, 436 U.S. 658, 691 (1978). Such an entity may be liable under § 1983,

however,

> if the governmental body itself "subjects" a person to a deprivation
> of rights or "causes" a person "to be subjected" to such deprivation.
> But, under § 1983, local governments are responsible only for their
> own illegal acts.

<u>Connick v. Thompson</u>, 131 S. Ct. 1350, 1359 (2011) (citations omitted).

> Plaintiffs who seek to impose liability on local governments under §
> 1983 must prove that action pursuant to official municipal policy
> caused their injury. Official municipal policy includes the decisions
> of a government's lawmakers, the acts of its policymaking officials,

and practices so persistent and widespread as to practically have the force of law.

Id. (citations omitted).

> [A] municipality may be held liable for the unconstitutional acts of its officials or employees when those acts implement or execute an unconstitutional municipal policy or custom. For a municipality to be liable, a plaintiff must prove that a municipal policy or custom was the moving force [behind] the constitutional violation.

Mettler v. Whitledge, 165 F.3d 1197, 1204 (8th Cir. 1999) (citations omitted).

"[A] 'policy' is an official policy, a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." Id. (citation omitted). Proof of a custom requires:

> (1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;
>
> (2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and
>
> (3) Th[e] plaintiff['s] injur[y] by acts pursuant to the governmental entity's custom, i.e., [proof] that the custom was the moving force behind the constitutional violation.

Id. (citation omitted).

### 2. Unconstitutional Policy or Custom

The school defendants argue that Plaintiffs have not satisfied the <u>Monell</u> standard because they have not alleged that any written or established District policy was consulted before R.S. was punished for her Facebook postings or before school officials read her private Facebook communications. Plaintiffs do not dispute the lack of a written policy regarding the District's regulation of online communications. Rather, they argue that their complaint alleges facts sufficient to establish a policy and custom of punishing students for out-of-school speech and also for school officials searching students' private online communications.

### a. Policy

Plaintiffs argue that Principal Falk's decisions to punish R.S. for her out-of-school online communications twice is evidence of his policy making. "Although rare, a public official's single incident of unconstitutional activity can establish the requisite policy if the decision is 'taken by the highest officials responsible for setting policy in that area of the government's business.'" <u>Rynders v. Williams</u>, 650 F.3d 1188, 1195 (8th Cir. 2011) (citations omitted). "In this scenario, municipal liability attaches only where the decisionmaker

possesses final authority to establish municipal policy with respect to the action ordered." Id.

The school defendants argue that none of the individuals named in the complaint have "final authority" to set District policy. In their view, only the publicly elected School Board has that authority. In this view, not even the District Superintendent could be said to ever set policy. The Supreme Court has distinguished between "final policymaking authority" and "final decisionmaking authority." See Davison v. City of Minneapolis, 490 F.3d 648, 660 (8th Cir. 2007). "The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." Pembaur v. City of Cincinnati, 475 U.S. 469, 481-82 (1986). The question here is whether Principal Falk's decisions to give R.S. a detention, an in-school suspension, and to prevent her from attending a school ski-trip constituted "policymaking" or merely "decisionmaking" pursuant to a policy set by higher authorities.

According to publicly available documents submitted by the parties in this case, "[t]he school principal is given the responsibility and authority to formulate building rules and regulations necessary to enforce [the Minnewaska Area

School District's student discipline] policy, subject to final school board approval." <u>See</u> "Student Discipline," Minnewaska School Board Policies § 506, <u>available at</u> http://www.minnewaska.k12.mn.us/District/SBPM/506.mht.  It would thus appear at this early stage that Principal Falk lacked final policy-making authority.  The Court need not finally resolve this issue because the Court concludes that Plaintiffs have alleged facts sufficient to show at least customs, if not policies, of the challenged behavior by the school defendants.

### b.  Custom

Plaintiffs have sufficiently alleged a custom of punishing and searching private out-of-school online communications by the school defendants.  In a short span of time, R.S. was <u>twice</u> punished for her out-of-school statements and subjected to a search of her private online communications by school officials.  The complaint further alleges that "on the basis of communications with other students and families, officials at Minnewaska Area Middle School have compelled other students to disclose their private information and have accessed students' on-line accounts on multiple occasions, under circumstances similar to those alleged [in the complaint]."  (Compl. ¶ 49.)

The facts alleged in the complaint are more than bare legal conclusions.  At the motion to dismiss stage, the Court must take the allegations in the complaint to be true.  While the school defendants correctly point out that "[l]iability for an unconstitutional custom or usage . . . cannot arise from a single act," McGautha v. Jackson Cnty., Mo., Collections Dep't, 36 F.3d 53, 57 (8th Cir. 1994), Plaintiffs have alleged more than a single act here.  The allegation that multiple students have been punished for off-school online activities and have experienced similar searches of their private communications supports a finding that the school officials implicated here were motivated by, and conducting themselves in accordance with, a "continuing, widespread, persistent pattern of unconstitutional misconduct."  Mettler, 165 F.3d at 1204.

For these reasons, the Court concludes that Plaintiffs' complaint satisfies the standard set out in Monell.  The Court will therefore deny the school defendants' motion to dismiss on that basis.

### C.    Qualified Immunity

#### 1.  Standard

Under the qualified immunity doctrine, government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known.  Officials are not liable for incorrect decisions made in gray areas of the law.

Burke v. Sullivan, 677 F.3d 367, 370-71 (8th Cir. 2012) (citations omitted).

> To defeat a defense of qualified immunity, a plaintiff must show: (1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation.

Id. (citations omitted).  "For the purposes of step two, 'clearly established' means

the contours of the right must be sufficiently clear that a reasonable official

would understand that what he is doing violates that right."  Jones v. McNeese,

675 F.3d 1158, 1161 (8th Cir. 2012) (citation omitted).  Although the clearly

established test does "not require a case directly on point, . . . existing precedent

must have placed the statutory or constitutional question beyond debate."

Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2083 (2011) (citations omitted).

### 2.  Alleged First Amendment Violation

#### a.  Constitutional Violation

For more than forty years, the United States courts have recognized that

students do not check their First Amendment rights at the schoolhouse door:

> In our system, state-operated schools may not be enclaves of totalitarianism.  School officials do not possess absolute authority over their students.  Students in school as well as out of school are 'persons' under our Constitution.  They are possessed of

fundamental rights which the State must respect, just as they
themselves must respect their obligations to the State. In our
system, students may not be regarded as closed-circuit recipients of
only that which the State chooses to communicate. They may not be
confined to the expression of those sentiments that are officially
approved. In the absence of a specific showing of constitutionally
valid reasons to regulate their speech, students are entitled to
freedom of expression of their views.

Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 511 (1969). In Tinker,

the Supreme Court concluded that a school district could not punish students for

wearing black arm bands—symbolizing their objections to the Vietnam War—at

school, because the "the record [did] not demonstrate any facts which might

reasonably have led school authorities to forecast substantial disruption of or

material interference with school activities, and no disturbances or disorders on

the school premises in fact occurred." Id. at 514. Under Tinker and its progeny,

student speech may be regulated only in limited circumstances. As the Supreme

Court explained in 2007, "student expression may not be suppressed unless

school officials reasonably conclude that it will materially and substantially

disrupt the work and discipline of the school." Morse v. Frederick, 551 U.S. 393,

403 (2007) (citation omitted). Out-of-school speech by a student is subject to even

less stringent school regulation than in-school speech. See id. at 405 (explaining,

for example, that a lewd speech may be appropriately regulated if delivered within school, but not if delivered outside of school).

The movement of student speech to the internet poses some new challenges, but that transition has not abrogated the clearly established general principles which have governed schools for decades. A recent case decided by the Eight Circuit, D.J.M. v. Hannibal Public School District # 60, 647 F.3d 754 (8th Cir. 2011), is instructive: There the court examined a case in which a student engaged in an online instant message conversation with a classmate outside of school. The student had indicated, among other things, that he was inclined to shoot particular students and groups of students at his school. Id. at 758. The contents of the conversation reached school officials, who then disciplined the student for his threatening speech. Id. at 759. The Court concluded that the student's First Amendment rights had not been violated, basing its conclusion on two established constitutional doctrines.

First, the Court applied the principle that true threats of physical violence are generally not protected under the First Amendment from government proscription. Id. at 761; see Doe v. Pulaski Cnty. Special Sch. Dist., 306 F.3d 616, 622 (8th Cir. 2002) (en banc) (citing Watts v. United States, 394 U.S. 705, 707

(1969) (per curiam)).  A "true threat" is a "statement that a reasonable recipient would have interpreted as a serious expression of an intent to harm or cause injury to another."  <u>Doe</u>, 306 F.3d at 624.  "The speaker must in addition have intended to communicate his statement to another."  <u>D.J.M.</u>, 647 F.3d at 762.  In <u>D.J.M.</u> the court concluded that the plaintiff's statements, which indicated that he had access to weapons, an intent "to bring a gun to school to shoot everyone he hates and then himself," and a "desire to kill at least five classmates" were sufficiently serious to be considered true threats, ineligible for First Amendment protection.  <u>Id.</u> at 762-63.

Second, the court concluded that the student's threats implicated <u>Tinker</u>'s substantial and material disruption doctrine, explaining that, while "[s]chool officials cannot constitutionally reach out to discover, monitor, or punish any type of out of school speech," the calculus may change where serious and violent threats which substantially disrupt the school environment are concerned. <u>D.J.M.</u>, 647 F.3d at 765-66; <u>accord</u> <u>Wisniewski v. Bd. of Educ. of Weedsport Cent. Sch. Dist.</u>, 494 F.3d 34, 36 (2d Cir. 2007) (applying <u>Tinker</u> standard where regulated violent speech "pose[d] a reasonably foreseeable risk that [it] would come to the attention of school authorities" and also caused a material and

substantial disruption to the "work and discipline of the school").  In <u>D.J.M.</u>, the court noted that the plaintiff's online speech had, in fact, caused a substantial disruption at the school, prompting phone calls from multiple students and parents who felt threatened by "a rumored 'hit list.'"  <u>D.J.M.</u>, 647 F.3d at 766.

The law on out-of-school statements by students can thus be summarized as follows:  Such statements are protected under the First Amendment and not punishable by school authorities unless they are true threats or are reasonably calculated to reach the school environment <u>and</u> are so egregious as to pose a serious safety risk or other substantial disruption in that environment.  R.S.'s Facebook wall postings were not true threats or threats of any kind.  While her statements may have been reasonably calculated to reach a school audience, that possible fact is not sufficient to justify her punishment.  The school defendants must also show that the statements posed a substantial disruptive effect.

The content of R.S.'s wall postings are a far cry from the statements made by the students in cases in which courts have approved of school intervention.  The Court notes that the Supreme Court reasoned in <u>Tinker</u> that black arm bands worn in opposition to the Vietnam War were not likely to cause the requisite substantial disruption to justify punishment. 393 U.S. at 514.  Based on the facts

alleged in Plaintiffs' complaint, a reasonable reader could not consider her

statements likely to cause a substantial disruption to the school environment.

R.S. stated that she "hated" a particular adult school employee because that

employee was mean to her, and she then expressed salty curiosity about who

had "told on her." Such statements were not likely to cause a substantial

disruption to the school environment.

### b. Right Clearly Established

The school defendants argue that they are entitled to qualified immunity

because the protected status of out-of-school online speech was not sufficiently

clear at the time of the alleged violation. They point to the Eighth Circuit's

decision in <u>D.J.M.</u> as evidence that the law in this area is unclear. <u>See</u> <u>D.J.M.</u>, 647

F.3d at 767 (noting that "the [Supreme] Court has not yet had occasion to deal

with a school case involving student threats or one requiring it to decide what

degree of foreseeability or disruption to the school environment must be shown

to limit speech by students").

As the above discussion shows, however, the general rule that schools may

not regulate merely inappropriate out-of-school speech (as opposed to truly

threatening or substantially disruptive speech) has been well-established for

decades.  See Morse, 551 U.S. at 405; Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 688 (1986) (Blackmun, J., concurring).  The Eighth Circuit's opinion in D.J.M. did not change this general rule.  In fact, D.J.M. affirmed the principle that school officials may not simply "reach out to discover, monitor, or punish any type of out of school speech."  647 F.3d at 765.  The opinion in D.J.M. merely explained the contours of a narrow exception to the general rule—an exception which applies to true threats or egregious statements likely to make their way to school and cause a substantial disruption to the school environment.

Courts have applied such an exception sparingly, applying it only to the most violent and threatening forms of speech and consistently declining to expand it to extremely offensive but nonviolent out-of-school speech.  The Third Circuit sitting en banc recently concluded, for example, that a school district impermissibly punished a student for setting up an out-of-school "parody profile" of his school's principal on the website MySpace—a social networking website similar to Facebook.  Layshock ex rel. Layshock v. Hermitage Sch. Dist., 650 F.3d 205, 207-08 (3d Cir. 2011) (en banc).  The profile created by the student featured a picture of the principal (taken from a school website) and stated that the principal was "too drunk to remember" his birthday and was also

23

a "big steroid freak," a "big whore," and a "big fag." Id.  In spite of these

malicious and inflammatory statements—statements far more offensive than

those at issue here—the court concluded that the school district was "not

empowered to punish [the student's] out of school expressive conduct" because

that conduct was not disruptive to the school environment.  Id. at 219.

The result was the same in the case of an eighth grader who created a

MySpace profile which featured the picture of another school principal, referred

to him as "your oh so wonderful, hairy, expressionless, sex addict, fagass [sic],

put on this world with a small dick PRINCIPAL," and contained myriad other

examples of "profanity and shameful personal attacks aimed at the principal and

his family."  J.S. ex rel. Snyder v. Blue Mountain Sch. Dist., 650 F.3d 915, 920-

21 (3d Cir. 2011) (en banc).  In assessing the disruptive effect of this contumelious

out-of-school rant, the Third Circuit reasoned:

> If Tinker's black armbands—an ostentatious reminder of the highly
> emotional and controversial subject of the Vietnam war—could not
> "reasonably have led school authorities to forecast substantial
> disruption of or material interference with school activities,"
> [Tinker, 393 U.S. at 514], neither [could the student's MySpace]
> profile, despite the unfortunate humiliation it caused for [the
> principal].

Such cases demonstrate that the existence of the narrow exceptions recognized in D.J.M. does not render unclear the established general rule against school regulation of merely inappropriate or offensive out-of-school speech.

The standard for showing a clearly established right is certainly stringent, but that standard has been met here thus far. Several high-profile Supreme Court cases have distinguished between regulation of in-school speech and out-of-school speech. Recent cases approving of school regulation of particularly violent and threatening out-of-school speech have little applicability here and do not cast doubt on the general rule which, assuming the veracity of the facts alleged in the complaint, controls here. The facts alleged in Plaintiffs' complaint place R.S.'s speech in the heartland of protected nonviolent and nondisruptive out-of-school speech. The Court concludes that a reasonable official would understand that punishing such speech would transgress R.S.'s right to free speech. As R.S.'s right to speak as alleged without school interference was clearly established, the Court will deny the school defendants' motion for qualified immunity at this early stage.

### 3. Alleged Fourth Amendment Violation

### a. Constitutional Violation

Students enjoy a Fourth Amendment right to be free from unreasonable searches and seizures by school officials.  See New Jersey v. T.L.O., 469 U.S. 325, 336-37 (1985) ("In carrying out searches . . . school officials act as representatives of the State, not merely as surrogates for the parents, and they cannot claim the parents' immunity from the strictures of the Fourth Amendment.").  In determining whether a search is reasonable, the Court must "consider first the 'scope of the legitimate expectation of privacy at issue,' then the 'character of the intrusion that is complained of,' and finally the 'nature and immediacy of the governmental concern at issue' and the efficacy of the means employed for dealing with it."  Doe ex rel. Doe v. Little Rock Sch. Dist., 380 F.3d 349, 352 (8th Cir. 2004) (quoting Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 654-66 (1995)).

### i. Reasonable Expectation of Privacy

Defendants question whether R.S. had a reasonable expectation of privacy with respect to the private information posted to her Facebook account and private communications that she made with other students via Facebook.  Here it is important to note that Facebook provides different means of communication.

Postings to a user's "wall" are generally accessible by the user's Facebook "friends," a potentially large group of acquaintances. Other sorts of messages operate in the same manner as email—that is, they are sent from one user to one or more other specified users. They are not open to perusal by one's "friends" or by the general public.

Courts have long recognized that a person's reasonable expectation of privacy "turns in large part" on their "ability to exclude others from the place searched." Minnesota v. Carter, 525 U.S. 83, 107 (1998) (Ginsburg, J., dissenting); see, e.g., Rakas v. Illinois, 439 U.S. 128, 149 (1978). "Letters and other sealed packages are in the general class of effects in which the public at large has a legitimate expectation of privacy; warrantless searches of such effects are presumptively unreasonable." United States v. Jacobsen, 466 U.S. 109, 114 (1984); see United States v. Forrester, 512 F.3d 500, 511 (9th Cir. 2008) (tracing this principle through history). Moreover, it has been an established principle, at least since the Supreme Court's decision in Katz v. United States, that the Fourth Amendment protects individuals from intrusions upon their private electronic conversations. 389 U.S. 347, 361-62 (1967) (Harlan, J., concurring).

"Given the fundamental similarities between email and traditional forms of communication, it would defy common sense to afford emails lesser Fourth Amendment protection."  United States v. Warshak, 631 F.3d 266, 285-86 (6th Cir. 2010).  Numerous courts have similarly concluded that individuals maintain a reasonable expectation of privacy with respect to their private email accounts and that such accounts are entitled to the same Fourth Amendment protections as conventional letters.  See, e.g., United States v. Zavala, 541 F.3d 562, 577 (5th Cir. 2008) (concluding that defendant had a reasonable expectation of privacy with respect to "private information, including emails" stored on his cellular phone); Forrester, 512 F.3d at 511 ("The privacy interests in these two forms of communication [email and traditional mail] are identical.").  One court recently concluded that private Facebook messages are, like email, "inherently private" because such messages "are not readily accessible to the general public."  Crispin v. Christian Audigier, Inc., 717 F. Supp. 2d 965, 991 (C.D. Cal. 2010).  The Court agrees that one cannot distinguish a password-protected private Facebook message from other forms of private electronic correspondence.

Based on Plaintiffs' complaint, at least some of the information and messages accessed by the school officials were in R.S.'s exclusive possession,

protected by her Facebook password.  R.S. controlled those items until she

involuntarily relinquished her password.  As with a private letter, the content of

R.S.'s electronic correspondence was available only to her and her

correspondent.  The Court concludes, based on established Fourth Amendment

precedent, that R.S. had a reasonable expectation of privacy to her private

Facebook information and messages.

### ii.  Nature of the Search

The facts in the complaint allege that the school officials conducted an

exhaustive search of R.S.'s Facebook account, and possibly her personal email

account.  There is no indication at this stage that they tailored their search in any

way.  It would have been difficult for them to tailor their search in pursuit of a

legitimate government interest because, as discussed below, such an interest

appears to have been lacking.

### iii.  Government Interest in the Search

The school defendants assert that since the reasonable search analysis

requires a complicated and fact-intensive balancing of interests, the Court cannot

conclude that their alleged behavior violated R.S.'s clearly established rights.

Plaintiffs respond that the search was clearly unreasonable because one of the

interests to be balanced—a legitimate school interest motivating the search—is completely absent.

The Supreme Court has made clear that the school interest balanced against a student's reasonable expectation of privacy is the "substantial interest of teachers and administrators in maintaining discipline <u>in the classroom and on school grounds</u>." <u>T.L.O.</u>, 469 U.S. at 339 (emphasis added); <u>see also</u> <u>id.</u> at 337 ("On one side of the balance are arrayed the individual's legitimate expectations of privacy and personal security; on the other, the government's need for effective methods to deal with <u>breaches of public order</u>."). Here, Plaintiffs contend, the school could not have been interested in conduct in the classroom or on school grounds because R.S.'s activity occurred exclusively off of school grounds.

Moreover, Plaintiffs argue that the school officials had no "reasonable grounds for suspecting that the search [would] turn up evidence that the student has violated or is violating either the law or the rules of the school." <u>Id.</u> at 342. Based on the facts alleged in the complaint, the school officials had reason to believe that R.S. may have had a sex-related discussion with a classmate. Both R.S. and her classmate had already admitted as much to the school officials prior

to the search. Plaintiffs contend that such an out-of-school discussion, even a "naughty" one, broke no law or school policies.

At this stage, based on the facts alleged in Plaintiffs' complaint, the Court cannot disagree. It is difficult for the Court to discern what, if any, legitimate interest the school officials had for perusing R.S.'s private communications. The officials' search of R.S.'s private correspondence does not appear to have been motivated by an interest in "maintaining discipline in the classroom and on school grounds" or in "deal[ing] with breaches of public order." Id. at 337, 339. Moreover, the school officials had no reason to believe that the search would return evidence of illegal behavior or violations of school policy. Id. at 342. At this stage, there is no discernible school interest against which to balance R.S.'s reasonable expectation of privacy. For these reasons, the Court concludes that R.S. has alleged facts sufficient to show that she had a reasonable expectation of privacy at least with respect to her private Facebook messages and that the school officials had no legitimate interest in searching them against her will.

### b. Right Clearly Established

A student's right to be free from an unreasonable search—that is, a search without a justifying and legitimate government interest—of private

correspondence in school is clearly established.  See T.L.O., 469 U.S. at 339 (noting that students do not "waive[] all rights to privacy" to "highly personal items [such] as photographs, letters, and diaries" simply "by bringing them onto school grounds").  At this stage, the Court has heard only one side of this story. While discovery may reveal facts which provide a legitimating school interest, it would be inappropriate for the Court to now speculate as to such interests.

For the above reasons, and at this early stage in the litigation, the Court denies qualified immunity to the school defendants with respect to Plaintiffs' Fourth Amendment claim.

## D.    Claims against Individuals in their Official Capacities

The school defendants ask that the claims against them in their official capacities be dismissed because those claims are duplicative of the claims against their employer.  See Kentucky v. Graham, 473 U.S. 159, 165-66 (1985).  Where claims against individuals in their personal capacity are dismissed, remaining claims against them in their official capacity may be unnecessary.  See, e.g., Soffer v. Costa Mesa, 798 F.2d 361, 363 (9th Cir. 1986).  Here, because the Court concludes that the school defendants are not entitled to qualified immunity at this stage, they remain as named defendants in this case, and the Court need not

now address whether the official capacity claims ought to be dismissed as duplicative.

### E. Supervisory Liability of Superintendent Ohl

"A supervisor may be held individually liable under § 1983 if he directly participates in the constitutional violation or if he fails to train or supervise the subordinate who caused the violation." <u>Brockinton v. City of Sherwood</u>, 503 F.3d 667, 673 (8th Cir. 2007). The school defendants argue that Plaintiffs' claims against Superintendent Ohl must be dismissed because there is no allegation that he directly participated in the alleged unconstitutional conduct or that he failed to properly train or supervise the District employees who were involved in the challenged conduct.

Plaintiffs respond that their complaint sufficiently raises facts which, when read as a whole, indicate that Superintendent Ohl failed to train or supervise the District employees who engaged in the challenged conduct. The complaint alleges that he was responsible for "ensuring that the District and its officials act in conformity with the United States Constitution and applicable federal and state laws." (Compl. ¶ 7.) Plaintiffs further allege that the District is "responsible for implementing district-wide policies and procedures, and for

training its employees."  (Id. ¶ 6.)  They also allege that the policies, customs, and

practices in the District permit or encourage unconstitutional behavior by staff

members.  (Id. ¶ 26.)

While it may be difficult for Plaintiffs to prove their allegations regarding

Superintendent Ohl's role in supporting a custom of unconstitutional practices as

alleged, the Court concludes that Plaintiffs have alleged facts sufficient to find

him liable for such a custom.  Discovery will allow both sides an opportunity to

explore Superintendent Ohl's role in the alleged behavior of his subordinates.

### F.      Conspiracy Claims

To establish a conspiracy to violate a plaintiff's civil rights in breach of 42

U.S.C. § 1985(3), the plaintiff must prove: "(1) the existence of a civil conspiracy;

(2) that the purpose of the conspiracy was to deprive [her] either directly or

indirectly of [her] civil rights; (3) that a conspirator did an act in furtherance of

the object of the conspiracy; and (4) damages, shown by demonstrating either

injury to person or property or the deprivation of a civil right."  Mettler, 165 F.3d

at 1204 (citation omitted).  As explained by the Supreme Court in Griffin v.

Breckenridge, "[t]he language [in § 1985(3)] requiring intent to deprive of equal

protection, or equal privileges and immunities, [i.e., the second element

identified in <u>Mettler,</u>] means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." 403 U.S. 88, 102 (1971). "Speculation and conjecture are not enough to prove a conspiracy exists." <u>Mettler</u>, 165 F.3d at 1206.

Moreover, "to prove [a conspiracy to violate civil rights], Plaintiff must allege specific facts indicating a mutual understanding among the conspirators to take actions to an unconstitutional end." <u>Feist v. Simonson</u>, 36 F. Supp. 2d 1136, 1150 (D. Minn. 1999), <u>aff'd</u> 222 F.3d 455 (8th Cir. 2000), <u>overruled on other grounds</u>, <u>Helseth v. Burch</u>, 258 F.3d 867 (8th Cir. 2001) (en banc). In other words, "there must be 'meeting of the minds' to support allegations of a conspiracy." <u>Feist</u>, 36 F. Supp. 2d at 1150.

Without reaching the other requirements for a claim under § 1985, the Court concludes that Plaintiffs have not sufficiently pled facts which could lead to a conclusion that the conduct alleged in this case was motivated by "some racial, or perhaps other class-based, invidiously discriminatory animus." <u>Griffin</u>, 403 U.S. at 102. Plaintiffs argue that the alleged fact that the school officials searched R.S.'s private account but not that of a male classmate is sufficient to show a discriminatory animus on the part of the school officials against girls.

The Court concludes that this threadbare allegation is insufficient.  The Plaintiffs allege that other students' accounts had been similarly accessed.  If there were an allegation that the school targeted girls' accounts but not boys' accounts, then the claim might be stronger.  The mere fact that school officials searched R.S.'s account and declined to search a boy's account cannot support a finding of invidious discriminatory animus.

For this reason, the Court will grant the school defendants' motion to dismiss as to Plaintiffs' § 1985 claim.  And, since Plaintiffs' claim under 42 U.S.C. § 1986 requires a valid § 1985 claim, the Court will dismiss the § 1986 claim as well.  See Jensen v. Henderson, 315 F.3d 854, 863 (8th Cir. 2002).

### G.    State Constitutional Claims

The school defendants argue that there is no private right of action under Minnesota law for deprivations of rights contained in the Minnesota Constitution.  In support, they correctly note that "Minnesota has not enacted a statute equivalent to § 1983."  Thomsen v. Ross, 368 F. Supp. 2d 961, 975 (D. Minn. 2005).  They further cite Guite v. Wright, 976 F. Supp. 866, 871 (D. Minn. 1997), a case in which the Plaintiff conceded that there was "no private cause of action for violations of the Minnesota Constitution."  They also cite an

unpublished decision by the Minnesota Court of Appeals stating that "Minnesota does not allow private actions based on alleged violations of the Minnesota Constitution." <u>Davis v. Hennepin Cnty.</u>, 2012 WL 896409, at *2 (Minn. Ct. App. Mar. 19, 2012) (unpublished) (citing <u>Guite</u>).

In response, Plaintiffs note that this Court has explained that "Minnesota courts <u>have</u> recognized direct causes of action for violating certain sections of the Minnesota Constitution" and that the Minnesota Constitution provides a "'certain remedy in the laws' for injuries and wrongs." <u>Thomsen</u>, 368 F. Supp. 2d at 975 (quoting Minn. Const. Art. I, § 8 (2004)) (emphasis added).

In <u>Knudtson v. City of Coates</u>, 519 N.W. 2d 166, 169 (Minn. 1994), the Minnesota Supreme Court treated as justiciable a claim by a plaintiff that a state regulation violated his expressive rights under Art. 1, § 3 of Minnesota Constitution—the same provision cited here with respect to Plaintiffs' free speech claim. <u>Knudtson</u>—a published opinion of the Minnesota Supreme Court—therefore provides a basis for preserving R.S.'s claim of a violation of her free speech rights under the Minnesota Constitution.

As for R.S.'s claim regarding an unreasonable search under Art. I, § 10 of the Minnesota Constitution—the language of which is identical to the Fourth

Amendment—there does not appear to be any authority on the question, apart from this Court's assuming, but not deciding, that such a claim could proceed in Thomsen, 368 F. Supp. 2d at 975.

While the parties have spilled much ink on this issue, its practical effect is minimal. R.S.'s freedom of speech and freedom from unreasonable search are substantially the same and coextensive under the United States and Minnesota Constitutions. See State v. Wicklund, 589 N.W. 2d 793, 801 (Minn. 1999); Thomsen, 368 F. Supp. 2d at 976. Thus, any relief available under the Minnesota Constitution is likely to be coextensive with the relief available under § 1983. See id. at 975 ("[A]ny remedy potentially available to plaintiff for an alleged violation of his rights under the Minnesota Constitution is co-extensive with that available to him under Section 1983 for a violation of the Fourth Amendment."). The school defendants assert that allowing the state constitutional claims to remain will create unnecessary work. Given that the substantive claims and potential relief are the same, however, the Court declines to dismiss Plaintiffs' state constitutional claims at this stage.

**H.**    **State Tort Claims**

**1.  Intentional Infliction of Emotional Distress**

To succeed on a claim of intentional infliction of emotional distress

("IIED") under Minnesota law, a plaintiff must establish four elements:

> (1) the conduct must be extreme and outrageous; (2) the conduct
> must be intentional or reckless; (3) it must cause emotional distress;
> and (4) the distress must be severe.

Hubbard v. United Press Int'l, Inc., 330 N.W. 2d 428, 438-39 (Minn. 1983).  The

Minnesota Supreme Court has explained that such claims are "sharply limited to

cases involving particularly egregious facts."  Id. at 439.  Conduct is "extreme

and outrageous" only when it is "so atrocious that it passes the boundaries of

decency and is utterly intolerable to the civilized community."  Id. (citations

omitted).   Similarly, the emotional distress caused by this atrocious conduct

must be "so severe that no reasonable [person] could be expected to endure it."

Id. at 440.  These standards are difficult to meet.

As troubling as R.S.'s allegations may be, the Court concludes that they do

not meet the requirements for an IIED claim.  The Court concludes that a

reasonable fact-finder could not find that the alleged behavior of the school

defendants was utterly intolerable to the civilized community.  "[S]chool

authorities" may be held liable for emotional distress arising from "abuse[s] of their position," but not for mere "indignities . . . that are not extreme or outrageous." Restatement (Second) of Torts § 46 cmt. e. The behavior alleged here was arguably a callous, intrusive, and insensitive abuse of power, but a reasonable fact-finder could not find it so "utterly intolerable" or "particularly egregious" as to support an IIED claim. For this reason, the Court will dismiss Count VII of Plaintiffs' complaint.

### 2. Invasion of Privacy

To assert a claim for invasion of privacy under Minnesota law, a plaintiff must prove that the defendant committed "(a) an intrusion; (b) that is highly offensive; and (c) into some matter in which a person has a legitimate expectation of privacy." Swarthout v. Mut. Serv. Life Ins. Co., 632 N.W. 2d 741, 744 (Minn. Ct. App. 2001). The intrusion must be "of a kind that would be highly offensive to the ordinary reasonable [person], as the result of conduct to which the reasonable [person] would strongly object." Id. at 745 (citation omitted). Application of this "reasonable person standard" is typically a question of fact, but it can become a question of law "if reasonable persons can draw only one conclusion from the evidence." Id. (citation omitted).

Defendants argue that R.S. had no reasonable expectation of privacy with respect to her private Facebook messages.  They note that she was below the age required by Facebook's terms of service.  It is unclear to the Court why a violation of a website's terms of use vitiates an expectation of privacy.[1]  As discussed above, Facebook's private messaging service operates in all practical ways as an email service, and individuals have an expectation of privacy when using email, just as they do when sending traditional letters.  The school defendants also contend that R.S. had no reasonable expectation of privacy because her account had been viewed by her mother and by "at least one other mother at her school."   Those facts do not appear in the complaint, but even if they did, it is not clear how they would influence the expectation of privacy analysis.  It makes little sense to say that an individual who shows an email to another individual thereby gives up all expectation of privacy as to his or her

---

[1] If it is true that R.S. violated the Facebook terms of service, she was not alone.  According to a recent study, there are approximately 7.5 million Facebook users in the United States who are under the age of 13, and there are over 5 million who are under the age of 10.  See, e.g, Shan Li, "Consumer Reports: Facebook has 7.5 million underage users," Los Angeles Times, May 10, 2011, available at http://latimesblogs.latimes.com/technology/2011/05/facebook-has-75-million-underage-users-survey-says.html.  Any argument that these young children should be afforded fewer privacy protections from involuntary intrusions by non-parents holds no water.

entire password-protected email account or with respect to members of the general public. For these reasons, the Court will not dismiss Plaintiffs' invasion of privacy claim.

## I. Claims by S.S.

The school defendants request that the Court dismiss all direct claims brought by plaintiff S.S. in her individual capacity. The dispute on this point seems centered around the caption of the case which states that S.S. is a party "individually and on behalf of her daughter [R.S.]" and a statement in Plaintiffs' complaint which states that S.S. "brings this action individually and on behalf of her minor daughter, R.S." The parties appear to agree that S.S. has no independent claims for individual damages or other relief.

Guardians may sue on behalf of their children. Fed. R. Civ. P. 17(c)(1)(A). While the Court agrees that dismissal of any direct claims by S.S. would be appropriate, none have been asserted. To clarify this matter, the Court will amend the caption of the case, so that it is clear that S.S. is a party to the suit on behalf of her daughter only.

**J.      Declaratory Judgment Claim**

The school defendants argue that Plaintiffs' declaratory judgment claim should be dismissed because it is duplicative of other claims.  Under the Declaratory Judgment Act, 28 U.S.C. § 2201(a), "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration."

The school defendants note that some courts have reasoned that, "[a]lthough the availability of alternative remedies is not a bar to declaratory relief . . . the district court may in its discretion refuse declaratory relief if the alternative remedy is more appropriate."  Smith v. Metro. Prop. and Liab. Ins. Co., 629 F.2d 757, 759 (2d Cir. 1980).  They also note that this Court has dismissed a declaratory judgment as inappropriate where the case had reached a stage where the parties could and had sought coercive remedies, including damages and injunctive relief.  See Kirckof v. Brown, Civ. No. 01-476 (JRT/SRN), 2002 WL 31718394, at *6 (D. Minn. Nov. 27, 2002).  The Court did so upon ruling on the parties' cross motions for summary, however, not at the motion to dismiss stage.

It would be premature to dismiss an otherwise viable claim at the motion to dismiss stage simply because it appears to be duplicative. Given that other claims may be dismissed upon summary judgment, the Court declines to dismiss the declaratory judgment claim at this time.

**K.      Motion to File Supplemental Brief**

Shortly before oral argument in this matter, the school defendants filed a motion to file a supplemental memorandum of law in support of their motion to dismiss. The school defendants submit that they recently discovered that R.S. has moved out of the District. They therefore argue that her claims for injunctive relief against the District are now moot. <u>See</u> <u>McFarlin v. Newport Special Sch. Dist.</u>, 980 F.2d 1208, 1211 (8th Cir. 1992) (declining to apply the "capable of repetition, yet evading review" doctrine in such circumstances).

Plaintiffs respond by noting that the Eighth Circuit has indicated that claims for injunctive relief may remain where a plaintiff may return to the school district in question. <u>Schanou v. Lancaster Cnty. Sch. Dist. No. 160</u>, 62 F.3d 1040, 1043 (8th Cir. 1995) (finding no standing where plaintiff had "no prospect of ever returning to the school district as a student"). Other courts have found standing for injunctive relief claims where plaintiffs have shown that they left the district

because of the challenged policy or where they intended to return to the defendant district.  See, e.g., Frechel-Rodriguez v. Puerto Rico Dep't of Educ., 478 F. Supp. 2d 191, 198 (D.P.R. 2007).

The Court concludes that the school district's motion would be more appropriate as a motion for partial summary judgment, brought after both sides have had time to explore this issue through discovery.  The Court will therefore grant the school defendant's request to file their "supplemental brief" but will deny the motion to dismiss Plaintiffs' injunctive relief claim.

## V.    Conclusion

As the Court has already explained, this case is still in its infancy.  The Court's rulings here are based on an assumption that the facts alleged by Plaintiffs in their complaint are true.  The Court's denial of the school defendants' qualified immunity claims should not be taken as an assessment of their ultimate liability for the actions alleged by Plaintiffs.  Discovery may reveal facts which change the Court's analysis of the school defendants' qualified immunity claims or of the ultimate merits of Plaintiffs' claims.  These issues will be evaluated again at summary judgment, upon the record developed in discovery.

Accordingly, based upon the files, records, and proceedings herein**, IT IS**

**HEREBY ORDERED**:

1) The school defendants' Motion for Dismissal [Docket No. 13] is **GRANTED IN PART** and **DENIED IN PART** as follows: Counts I, II, IV, V, VI, and VIII **REMAIN**, Count III is **DISMISSED** without prejudice, and Count VII is **DISMISSED** with prejudice;

2) The school defendants' Motion to File Supplemental Memorandum of Law [Docket No. 22] is **GRANTED**, the Proposed Supplemental Memorandum is deemed filed, and the motion to dismiss on mootness grounds is **DENIED** without prejudice;

3) The caption of the case is amended such that the plaintiffs in this case are identified as "R.S., a minor, by and through her mother, S.S."

Dated: September 6, 2012          s/ Michael J. Davis
                                  Michael J. Davis
                                  Chief Judge
                                  United States District Court